UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

In re:

CROSSFIRE METALWORKS, LLC,

Debtor.

Case No. 25-00673-BRW

Chapter 7

## MEMORANDUM DECISION

**Appearances:**

Kimberly L. Stevens, Chapter 7 Trustee, pro se

Brett R. Cahoon, U.S. Trustee

## I.  INTRODUCTION

The U.S. Trustee (the "UST") objects to the compensation and expenses requested by Kimberly L. Stevens, chapter 7 trustee (the "Trustee") on behalf of the auctioneer she employed, Kent Corbett of Corbett Auctions and Appraisals, Inc. ("Corbett").  The Court held an in-person evidentiary hearing on the requested compensation and expenses on May 21, 2026.

Following presentation of evidence, including testimony from multiple witnesses and various exhibits admitted into evidence, as well as oral argument, the Court took the matter under advisement.  This Memorandum Decision resolves the issues presented to the Court.  FED. R. BANKR. P. 9014 and 7052.[1]

## II.  SUBJECT MATTER JURISDICTION, AUTHORITY, AND VENUE

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) as referred to it by the district court pursuant to General Order No. 349.

---

[1] Hereinafter, unless otherwise indicated, all statutory citations are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all citations to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM DECISION - 1

This is a "core" proceeding and is within the Court's constitutional authority to adjudicate via final order.  28 U.S.C. § 157(b)(2)(A).  Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### III.  FINDINGS OF FACT

This chapter 7 case was filed by the Debtor Crossfire Metalworks, LLC (the "Debtor") on September 2, 2025.  Doc. No. 1; Ex. 200.  The Trustee was duly appointed as the chapter 7 trustee in the case.  Doc. No. 2.

Relevant to the issues before the Court, the Trustee filed an application to employ Corbett as an auctioneer pursuant to § 327 on September 10, 2025 (the "Application").  Doc. No. 13; Exs. 101 and 201.  In the Application, the Trustee explained that she intended to employ Corbett to sell at a public auction personal property owned by the bankruptcy estate.  *Id.*

The Application had no written agreement attached to further detail the terms agreed to between the Trustee and Corbett.  *Id.*  The Trustee and Mr. Corbett confirmed in their testimony that beyond the terms stated in the Application, there is no other written agreement with respect to Corbett's employment in this case.

The Application provides for a tiered level of compensation depending on the price of the items sold.  *Id.*  As to the expected compensation, the Application provides in full:

a)  For Items Sold for $499.99 or less:

    a.  Commission: A commission of thirty percent (30%) on the gross sale price of the Property;

    b.  Buyer's Premium: A Buyer's Premium of ten percent (10%) for cash/check or thirteen percent (13%) for credit card, and (2%) online sell through fee (if online), on the gross sale prices of the Property shall be collected by the Auctioneer from the purchaser.

    c.  Expenses incurred: Reimbursement for reasonable and necessary expenses to prepare the

MEMORANDUM DECISION - 2

Property for sale.

b) For Items Sold for $500.00 - $999.99 or less:

    a. Commission: A commission of twenty percent (20%) on the gross sale price of the Property;

    b. Buyer's Premium: A Buyer's Premium of ten percent (10%) for cash/check or thirteen percent (13%) for credit card, and (2%) online sell through fee (if online), on the gross sale prices of the Property shall be collected by the Auctioneer from the purchaser.

    c. Expenses incurred: Reimbursement for reasonable and necessary expenses to prepare the Property for sale.

c) For Items Sold for $1,000 or more:

    a. Commission: A commission of ten percent (10%) on the gross sale price of the Property;

    b. Buyer's Premium: A Buyer's Premium of ten percent (10%) for cash/check or thirteen percent (13%) for credit card, and (2%) online sell through fee (if online), on the gross sale prices of the Property shall be collected by the Auctioneer from the purchaser.

    c. Expenses incurred: Reimbursement for reasonable and necessary expenses to prepare the Property for sale.

*Id.* Filed along with the Application was Mr. Corbett's verified statement indicating Corbett is "disinterested," pursuant to § 101(14), and acknowledging that its employment and compensation are subject to this Court's approval, as well as the Court's discretion to reduce or limit such compensation. Doc. No. 14; Ex. 202.

The Court approved Corbett's employment, as requested in the Application, by order on October 9, 2025, pursuant to § 327(a) with subsequent approval of compensation subject to § 330. Doc. No. 19; Ex. 203.

The sale of the personal property was noticed by the Trustee on November 6, 2025 (the

MEMORANDUM DECISION - 3

"First Notice of Sale").  Doc. No. 31; Ex. 204.  The First Notice of Sale provided the sale of "[a]ll equipment and inventory of Crossfire Metalworks, LLC" would be held on December 4, 2025, via an online, public auction.  *Id.*

The UST objected to the First Notice of Sale on November 26, 2025, pointing out that the Small Business Administration ("SBA") has a blanket lien on all the personal property owned by the Debtor, which fact was not disclosed in the First Notice of Sale.  Doc. No. 38.  Because of the SBA's blanket lien, as well as the existence of other secured creditors encumbering the assets, the UST could not determine whether the proposed sale would benefit the bankruptcy estate.  *Id.*  The UST suggested that any carve-out agreement between the SBA and the Trustee be completed prior to the sale.  *Id.*

In response to the UST's objection, the Trustee withdrew the First Notice of Sale on December 8, 2025.  Doc. No. 40.

A second notice of sale of the Debtor's personal property was filed by the Trustee on December 24, 2025 (the "Second Notice of Sale").  Doc. No. 42.  The Second Notice of Sale provides more information about the secured creditors' liens than the First Notice of Sale and discloses the carve-out agreement with the SBA.  *Id.* at 2.  With respect to the SBA, the Second Notice of Sale provided:

> The Small Business Administration (SBA) holds a blanket lien on the equipment and inventory.  The SBA has agreed that the equipment and inventory can be sold by auction, and that the bankruptcy estate will receive a carve-out of 40% of the gross proceeds, with the estate being responsible for the auctioneer fees.

*Id.*  The Second Notice of Sale further provided that the sale will be via online, public auction to be held on January 20, 2026.  *Id.*  No objection was filed to the Second Notice of Sale.

Relatedly, Corbett was also engaged by the Trustee as a realtor to sell real property

MEMORANDUM DECISION - 4

owned by the Debtor, after an original application to employ Corbett in this capacity was objected to by the UST.  *See* Doc. No. 46; Ex. 207 (the Trustee's second application to employ Corbett as a realtor in the case); *and* Doc. No. 55 (order approving the application to employ Corbett as a realtor).  Of relevance to the issues before the Court, the UST objected to the Trustee's initial application to employ Corbett as realtor because, among other reasons, the agreement between the Trustee and Corbett included a $5,000 "Marketing Fee" for the real property, *and* a 7%-10% commission to be paid to Corbett.  *See* Doc. No. 28 at 12; Ex. 205 at 12 (stating the "Marketing Fee"); *and* Doc. No. 36 at 6; Ex. 206 at 6 (the UST's objection to the application specifically pointing out the "Marketing Fee" as inappropriate in addition to the commission amount).

The personal property items to be sold by Corbett, as contemplated in the Application, were located at the Debtor's real property in a large warehouse in Payette, Idaho.  Mr. Corbett and his employees, Manuel Olivera, Mito Alonzo, Mel Easton, JP Sacht, and Justin Nesbit, who prepared the Debtor's personal property to be sold, testified at the hearing that upon first arrival at the warehouse, the facility lacked power and was in a state of disarray.  The testimony by Mr. Corbett and Corbett employees was that their first impression of the value of the items to be sold was around $100,000, with some stating a greater value and others believing the value was less.

Photos of the state of the real property and personal property at the Debtor's location were admitted into evidence.  Exs. 104 and 212.  While there was some debate about whether the photos truly showed disarray of the personal property to be sold, the Court credits the testimony of Mr. Corbett and his employees who completed the work on site to prepare the personal property for sale.  They testified persuasively that significant work was required to clean up and organize the personal property, compile it into lots for sale, identify and catalog the property, and

MEMORANDUM DECISION - 5

arrange for pick-up of the property by the various buyers.  According to their testimony, the work done at the property for "setup" took approximately 7 days.

Mr. Corbett testified, corroborated by Exhibit 103, that he and his team (which included Mr. Corbett and ten other employees) spent a total of 560 hours at the location completing this work.  Ex. 103.  Of those 560 hours, the bankruptcy estate was charged only for "setup costs," which totaled 335 hours at $45.00 per hour for a total labor expense of $15,075.00.  *Id.*  An exhibit explained:

> Setup costs included: cleaning entire property that was left in disarray, cleaning individual machines, matching up tooling with proper machines, hauling away trash[] to enable crew to lot/tag equipment ***This was not a simple job – equipment had to be cleaned/prepped before marketing could begin***

Ex. 103 (capitalization and bold removed).  As stated, only the "setup costs" were charged to the bankruptcy estate, however, there were multiple expenses and trips to the Debtor's location for which the bankruptcy estate was not charged.  *See* Ex. 103 (listing those expenses and trips not charged to the bankruptcy estate, including 225 hours of Corbett employees, and Mr. Corbett himself, at the property for "catalog/pickup").  Mr. Corbett testified that Corbett was required to rent various pieces of equipment to assist in the "setup" work, including a forklift and skid steer. The UST questioned at the hearing whether the forklift and the skid steer was used with "setup" work or in delivery to the purchaser.  In addition, Mr. Corbett testified that Corbett was required to hire a locksmith to conduct its work to prepare for the sale.

Testimony by Mr. Corbett and various employees showed that Corbett pays these employees $35.00 an hour.[2]  During Mr. Corbett's testimony, the hourly rates charged in this

---

[2] However, one of the employees, Mr. Nesbit, testified that the hourly rate paid to him was $30 and another witness, Mr. Alonzo, testified that he could not recall his hourly rate.  Mr. Sacht testified that he is a salaried employee; however, the estate was billed for 60 hours of his time at $45 per hour.

MEMORANDUM DECISION - 6

case were compared to some examples of Corbett's other engagements, and it appears the hourly rates utilized in those other non-bankruptcy engagements are higher or equal to those charged here. Ex. 105. Importantly, though, these hourly rates were described as expenses, allowed by the Application, and are in addition to the compensation (or fees) paid to Corbett via the "Buyers Premium" and the "Seller Fee."

In addition to the labor expense, Corbett details marketing expenses intended to be passed along to the bankruptcy estate totaling $10,398.51. Ex. 103. Included in the requested marketing amount is $7,704.18 for "Hibid Marketing." *Id.* at 1. However, during Mr. Corbett's testimony, he disclosed and confirmed that this amount was also included as part of the "Buyer's Premium" paid by the various buyers, referenced in the Application as the online 2% "sell through fee." *See* Doc. No. 13; Ex. 101 and 201 at 3. As such, and acknowledged by the Trustee during the hearing, this amount was not appropriately included as an expense to be borne by the estate separate from the "Buyer's Premium."[3] Deducting this charge leaves a total of $2,964.33 in marketing fees requested by Corbett. That amount is comprised of charges for online marketing for the personal property sale as detailed in the attachments to Exhibit 103. Through the marketing efforts, according to Corbett, the public online auction had 393 registered bidders from 24 states. Ex. 210.

Sales from the online public auction far exceeded the initial value estimate of

---

[3] The Court encourages parties seeking approval of fees and expenses in all cases to meet and confer regarding objections and to freely exchange information to support the amounts requested. Doing so in no way prevents the parties from bringing legitimate disputes to the Court for resolution, but this process will ensure the Court is addressing only issues that are truly in dispute. Apparently, Corbett and the Trustee refused the UST's request to further discuss the issues now before the Court and instead stated that the matter would be brought to the Court for a determination. Of course, this Court stands ready to address issues in its cases, however, needlessly litigating issues in bankruptcy cases only increases the expenses to be paid by the bankruptcy estate and, in the end, reduces recoveries for parties in interest, including the estate's creditors.

MEMORANDUM DECISION - 7

approximately $100,000.  Instead, purchases in the auction resulted in a "Total Invoice Sale Price" of $359,359.  Ex. 102 at 66.  Exhibit 102 lists the various sales of the personal property and calculates the commission—either 30 percent, 20 percent, or 10 percent, depending on the selling price of the item—pursuant to the Application.  This calculation resulted in a "Total Commission" of $49,568.65.  Ex. 102 at 66.  The total sales price, which added a 15% buyer's premium of $53,903.85 to the "Total Invoice Sale Price," was $413,262.85.  Doc. No. 68 at 1.  Mr. Corbett admitted on cross-examination, however, that the Application calls for a 12% buyer's premium when the buyer pays in cash or check (rather than with a credit card).  Mr. Corbett also admitted that there were purchases made by cash and check and acknowledged that there was no evidence in the record as to which purchases were paid for by credit card (*i.e.* the purchases that would qualify for a 15% buyer's premium under the Application).

On March 20, 2026, the Trustee filed a Report of Sale, which detailed the sale of the personal property.  Doc. No. 68 at 1.  It reports a total sale price of $413,262.85, reducing from this amount a commission of $49,568.65, a buyer's premium of $53,903.85, "auctioneer expenses" of $27,838.87, and a "lien payoff to SBA" of $215,615.40; for total "net proceeds to the estate" of $66,336.08.  *Id.* at 1.

On the same date, the Trustee filed a Motion for Order Approving Sale by Trustee as to the equipment and inventory Corbett sold via auction.  Doc. No. 69.  The Court granted this motion on March 20, 2026.  Doc. No. 72.

On March 23, 2026, the Trustee filed an Application for Compensation and Reimbursement of Expenses by Auctioneer for Trustee (the "Application for Compensation") on negative notice.  Doc. 74; Exs. 100 and 208.  In the Application for Compensation, Corbett seeks approval of the "Seller fee" of $49,568.65, which is his commission under the Application of

MEMORANDUM DECISION - 8

either 30, 20, or 10 percent of the sale of the personal property, depending on the sale price.  *Id.* at ¶ 4.  In addition, Corbett seeks approval of the "Buyer's premium" of $53,903.85.  *Id.*  This amount is 15% of the "Total Invoice Sale Price" of $359,359.  Additionally, Corbett seeks approval of expenses of $15,075 in labor (as further evidenced in Ex. 103); $10,389.13 in marketing expenses (also evidenced in Ex. 103); $780.49 for a forklift rental; $794.25 for the locksmith; and $800 for a skid steer rental.  *Id.* at ¶ 5.  In total, the Application for Compensation seeks approval of $103,472.50 for auctioneer commissions and buyer's premiums as well as $27,838.87 for reimbursement of expenses.  *Id.* at 3.

The UST timely objected to the Application for Compensation.  Doc. No. 77.  The Court held an in-person evidentiary hearing on May 21, 2026, addressing the Application for Compensation and the UST's objection thereto.

## IV.  ARGUMENTS OF THE PARTIES

At the hearing, the UST took the position that the Court should not allow any of the $15,075 in labor expenses, the forklift and skid steer rental expenses totaling $1,580.49, or any of the marketing expenses, even after reducing the "Hibid" expense of $7,704.18.  The basis for the UST's  argument is that Mr. Corbett does not actually pay his employees the $45 per hour charged to the bankruptcy estate, that some of the expenses and labor incurred were not in preparation of the sale, and that at least one of the employees who worked at the property was a salaried employee.  Therefore, the UST contends the Court should not award the labor expense at all because Corbett has failed to establish at the hearing that it was entitled to those line items. The UST also pointed out that Mr. Olivera testified that he worked 93.5 hours at the Debtor's location, rather than the 95.5 hours stated in Exhibit 103.  Based on the lack of proof and the discrepancies noted, the UST questioned whether the details of the time spent as reflected in

MEMORANDUM DECISION - 9

Exhibit 103 were accurate at all.  As to the marketing expenses, the UST argued that the Application for Compensation only contemplates that Corbett will receive "[r]eimbursement for reasonable and necessary expenses to prepare the Property for sale," and that marketing expenses fall outside this reimbursement category and should be included in the general commission to which Corbett is entitled.  In addition, the UST argued that Corbett had not carried its burden to justify the full buyer's premium of 15%  due to Mr. Corbett's acknowledgement that some of the buyers paid with cash or check, therefore the buyer's premium should be reduced to 12% across the board, rather than the 15% claimed.

In response, the Trustee argued that the provision for reimbursement under the Application should be read to include marketing expenses because those are necessary to prepare the property for sale but ultimately conceded that she was no longer seeking approval of the $7,704.18 "Hibid marketing" fee given the testimony at the hearing.  Additionally, the Trustee argued that the greater-than-expected results of the auction demonstrate the extra labor costs were justified as necessary and beneficial to the estate.

### V.  CONCLUSIONS OF LAW AND ANALYSIS

Sections 327 and 330, and Rules 2014 and 2016, "prescribe substantive and procedural rules applicable to employment and payment of estate professionals in bankruptcy cases." *In re Walker Land & Cattle, LLC.*, 535 B.R. 348, 351 (Bankr. D. Idaho 2015).

Under § 327(a), a trustee may employ professionals, including auctioneers, "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."  § 327(a).  Such employment first requires approval by the Court following an application for employment as outlined by Rule 2014.  This application "must state specific facts" including, the services to be

MEMORANDUM DECISION - 10

rendered and "any proposed arrangement for compensation." Rule 2014(a)(2); *see also* LBR 2014-1(a) (listing further requirements under the local rule). Any anticipated payment to an auctioneer or other professional must be disclosed, regardless of whether such payment is made by the estate or a third party. *In re Driller*, 2004 WL 1661981, at *2 (Bankr. D. Idaho July 7, 2004). This includes the use and details of a buyer's premium. *Id.*

Although disclosure of proposed compensation is required at the initial application for employment stage (*see* Rule 6005), it is ultimately addressed after application pursuant to § 330 and Rule 2016. The Court's approval is limited to "reasonable compensation for actual, necessary services rendered" by the professional and "reimbursement for actual, necessary expenses." § 330(a)(1)(A) and (B). The applicant bears the burden to demonstrate its entitlement to the compensation requested. *In re Walker Land & Cattle, LLC.*, 535 B.R. at 352; *Hale v. United States Trustee (In re Basham)*, 208 B.R. 926, 931-32 (9th Cir. BAP 1997), *aff'd* 152 F.3d 924 (9th Cir. 1998). In making this evaluation, the court must consider the nature, extent, and value of the rendered services, including "the time spent; the rate charged; the necessity and benefit of the services; whether the services were commensurate with the complexity, importance, and nature of the problem or task addressed; and whether the compensation is reasonable in light of customary compensation by comparably skilled professionals in non-bankruptcy cases." *In re Capps*, 2010 WL 883760, at *3 (Bankr. D. Idaho Mar. 8, 2010) (quoting § 330(a)(3)); *see also* § 330(a)(3)(E) (listing also a consideration of "whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field"). Where appropriate, and upon consideration of these factors, the Court may award compensation that is less than the amount requested by the applicant. § 330(a)(2); *In re Capps*, 2010 WL 883760, at *3.

MEMORANDUM DECISION - 11

These factors are also applicable to the reimbursement of expenses.  3 COLLIER ON BANKRUPTCY ¶ 330.4[1] (Richard Levin & Henry J. Sommers eds., 16th ed.).  However, the Court can only approve reimbursement for  *"actual, necessary expenses specific to and benefiting [the] estate*[,]" which may include costs for set-up in advance of a sale.  *In re Driller*, 2004 WL 1661981, at *7 (emphasis added); *see also Sousa v. Miguel (In re United States Trustee)*, 32 F.3d 1370, 1372-73 (9th Cir. 1994) (concluding that normal overhead expenses are not appropriately awarded under § 330(a)); *Max Rouse & Sons, Inc. v. Specialty Plywood, Inc. (In re Specialty Plywood, Inc.)*, 160 B.R. 627, 632-33 (9th Cir. BAP 1993), *opinion withdrawn following settlement*, 166 B.R. 153 (9th Cir. BAP 1994) (explaining that an "actual" expense is one that is "actually incurred" and not based on "guess work, formula, or pro rata allocation[,]" which must be supported by a detailed application); *In re Williams*, 102 B.R. 197, 199 (Bankr. N.D. Cal. 1989) (holding as to a trustee's fee application that "recovery will be allowed for *extraordinary* expenses to the extent they are associated with the *special needs* of an individual case and are *fully documented*[]") (emphasis in original); *In re Cal Farm Supply Co.*, 110 B.R. 461, 464 (Bankr. E.D. Cal. 1989) (rejecting the auctioneer's request for labor expenses because the court was not convinced those expenses were anything more than "customary overhead" of the auctioneer).

Applying these principles, the Court concludes not all of Corbett's requested compensation and expenses may be awarded.  First, as to the compensation to be awarded under § 330(a)(1)(A), the Court determines that it is appropriate to reduce the buyer's premium to 12% of the "Total Invoice Sale Price" of $359,359.00.  It was undisputed in Mr. Corbett's testimony that the requested 15% commission assumed that all the buyers paid with a credit card, thus incurring the additional 3% fee.  Mr. Corbett admitted, however, that some buyers paid with cash

MEMORANDUM DECISION - 12

or check.  As a result, the 15% requested in the Application overcompensates Corbett in the instances where the buyer paid in cash or by check.  Corbett bore the burden of proof at the hearing to justify the amount requested.  Because no breakdown of which buyers paid with credit card was provided, the Court determines it appropriate to apply the 12% buyer's premium to all sales at the auction, resulting in a reduction of the buyer's premium from $53,903.85 to $43,123.08 (or 12% of the "Total Invoice Sale Price").[4]  Also included in the buyer's  premium, as admitted by Mr. Corbett during his cross examination, is the $7,704.18 for the "Hibid Marketing," as shown in Exhibit 103, which was also requested as a separate marketing expense. Corbett is responsible for the amount owed to "Hibid," and the Court will not allow it as a compensable expense as requested in the Application.  To hold otherwise is tantamount to permitting double dipping.

Next, the Court concludes that the "Seller fee" of $49,568.65 is appropriate pursuant to Exhibit 102 and the terms of the Application.  Therefore, the Court will allow that amount as requested by Corbett.

The Court will turn next to the expenses requested, which analysis is governed by § 330(a)(1)(B).  Regarding the remaining "Marketing expenses" of $2,694.33 (after reducing the "Hibid" amount as detailed above), the Court agrees with the Trustee and Corbett that these marketing expenses fall within the term of the Application providing for "[r]eimbursement for reasonable and necessary expenses to prepare the property for sale."  Doc. No. 13; Ex. 101 and,

---

[4] Mr. Corbett testified that, beginning in January 2026, a 15% buyer's premium was charged on all sales, regardless of how payment was made.  However, this does not provide a basis to apply the 15% premium to sales by cash and check in this case.  Because his employment was approved by the Court in this case prior to the advent of that increase, and because the Application does not call for this amount to increase during the employment, the fee structure in place as stated in the Application applies here.  The Court makes no determination whether this new fee arrangement is reasonable for future engagements.

MEMORANDUM DECISION - 13

Ex. 201.  This was a reasonable and actual expense, specific to the auction, and the expenses helped the estate achieve greater than expected returns.  However, in the future, the Trustee and Corbett would be well advised to attach a full written agreement covering all terms of the Application and to also expressly state whether marketing expenses are to be paid separately from the commission.  This full disclosure of the terms will assist the Trustee and Corbett in the event of a dispute as to the particulars of the agreement, as well as provide full disclosure of the terms of the engagement to all parties in interest, including the UST, so that those parties may make an informed decision whether to object to Corbett's employment.

Next, the Court concludes that actual and necessary labor expenses were incurred by Corbett, which are compensable under the Application's terms and are beyond "normal overhead expenses," as discussed by the Ninth Circuit in *In re United States Trustee*.  However, the built-in margin of at least $10 per hour on the labor expenses as reflected in Exhibit 103 and as testified by the Mr. Corbett and his employees during the hearing is not appropriately awarded as an expense.  Again, the applicable Code provision calls for "reimbursement for *actual*, necessary expenses."  § 330(a)(1)(B) (emphasis added).  A mark-up of at least $10 on the hourly rate Corbett actually paid employees for their labor is not compensable under § 330(a)(1)(B) as an expense to be paid by the bankruptcy estate.  As such, the labor expense must be reduced.[5]

Mr. Corbett and some of the employees who worked at the Debtor's location testified credibly that there was a significant amount of work to do at the property to prepare the personal

---

[5] The Court notes that Corbett explained in an exhibit introduced at the hearing that "[w]e charged $45 Hr.[,] which covers taxes/expenses[;] no profit."  Ex. 103 at 1 (modified).  However, the Court has no evidence before it with respect to the "taxes/expenses" actually incurred by Corbett other than this statement and Mr. Corbett's testimony generally.  Additionally, these taxes and expenses may be regarded as typical overhead to be borne by Corbett, as detailed in the case law discussed above, which is not an expense to be paid by the bankruptcy estate.

MEMORANDUM DECISION - 14

property for sale.  The Court credits this testimony and determines that such expenses were actually incurred, reasonable, necessary, and beneficial to the estate and appropriately awarded pursuant to the terms of the Application.  However, Mr. Corbett testified that the employees were paid $35 per hour, not the $45 per hour requested in the Application for Compensation and as shown in Exhibit 103.  As such, $35 per hour is the actual expense incurred for this labor, and that is what is appropriately awarded.  This does not end the inquiry, however.  Mr. Nesbit testified that his hourly rate paid to him was $30 per hour—not $35, Mr. Sacht testified that he is a salaried employee, rather than an employee that is paid hourly, and Mr. Alonzo testified that he does not know how much he is paid per hour by Corbett.  Given Mr. Nesbit's testimony, the actual expense paid by Corbett is $30 per hour for the 10 hours charged to the estate for his labor.  While the Court may be justified in eliminating Mr. Sacht's requested labor amount as a salaried employee of Corbett, the Court concludes under these facts that the hours requested at the $35 rate are reasonable as an actual expense due to Mr. Sacht's work at the Debtor's location and the fact that he was not otherwise working for Corbett on other projects or duties.  Finally, while the Court may be justified in eliminating Mr. Alonzo's labor expenses based on his testimony that he could not recall the amount he was paid, the Court relies on Mr. Corbett's testimony that Mr. Alonzo and the other employees listed on Exhibit 103 were paid $35 per hour.  As such, the labor expense awarded under § 330(a)(1)(B) is reduced from $15,075.00 to $11,675.00 ($35 per hour multiplied by 325 hours, plus $30 per hour multiplied by 10 hours (Mr. Nesbit's hours in Exhibit 103)).

Relatedly, the Court concludes that the testimony of Mr. Corbett and his employees with respect to the other expenses (*i.e.* the locksmith, the forklift rental, and the skid steer rental) sufficiently persuade the Court that they are appropriately awarded as reasonable expenses

MEMORANDUM DECISION - 15

incurred by Corbett in preparing the sale.[6]

## VI.  CONCLUSION

In summary, the Court approves the Application as follows:

| | |
|---|---|
| Buyer's Premium | **$43,123.08** (reducing to 12% from 15%, which amount awarded includes $7,704.18 "Hibid Marketing Expense" to be paid out of this amount by Corbett) |
| Seller Fee | **$49,568.65** |
| Labor | **$11,675.00** |
| Marketing Expenses | **$2,694.33** |
| Forklift Rental | **$780.49** |
| Locksmith | **$794.25** |
| Skid steer Rental | **$800.00** |
| TOTAL FEES | **$92,691.73** |
| TOTAL EXPENSES | **$16,744.07** |

Because the carve-out agreement with the SBA calls for Corbett's expenses to be paid by the bankruptcy estate, the amount to be refunded by Corbett to the bankruptcy estate shall be paid to the Trustee for administration.

The Trustee shall submit a proposed order consistent with this ruling.  Additionally, the Trustee is ordered to file an accounting within fourteen (14) days of this Memorandum Decision

---

[6] While there was some dispute by the UST at the hearing whether these items and expenses were truly used with respect to the "setup" of the Debtor's property for the auction, the Court credits Mr. Corbett's testimony and that of his employees that these were indeed expenses actually incurred in those efforts.

MEMORANDUM DECISION - 16

detailing the amount the Trustee received from Corbett consistent with the findings and

conclusions stated herein.

DATED: June 8, 2026

Brent R. Wilson
U.S. Bankruptcy Judge

MEMORANDUM DECISION - 17